### Audit Report of the Township of Bristol 1967

*David N. Brook,* for auditors.

*William J. Carlin,* for petitioners.

LUDWIG, J., February 15, 1972.—On April 24, 1968, the elected Auditors of Bristol Township filed their financial report for the year 1967. The report surcharged each of the 10 township commissioners in the sum of $3,450.80 and the treasurer-tax collector in the sum of $62,247.70. It also reported a year-ending negative balance of $29,739.16 in the township's treasury. Four appeals followed and are consolidated in this proceeding.

Seven commissioners joined together in one appeal (no. 380); and the remaining three commissioners joined in another (no. 1306); the treasurer-tax collector filed separately (no. 381); and the board of commissioners, for the township, appealed from the finding of the treasury deficit.

### FINDINGS OF FACT

1. Bristol Township was in 1967 and continues to be a first class township.

2. The following were the Commissioners of Bristol Township in 1967: Richard Bonner, Walter L. Corson, Harry Fawkes, Richard Heirling, Jerry Powell, Jack Ward and Charles Worthington, who joined in appeal no. 380; and James N. Kline, Anthony J. Melio and Arthur B. Reinholt, who joined in appeal no. 1396.

3. The auditors in their financial report for the year 1967 surcharged each of the above-named township commissioners in the sum of $3,450.80 by disallowing the following items of payment made by the township:

(a) $140.90 to the "Buckingham Room" by check no. 30, dated January 18, 1967;

(b) $765 to Norman's Stationery by check no. 38, dated January 18, 1967;

(c) $2,500 to Mike Levine Associates by check no. 68, dated October 5, 1967; and

(d) $44.90 to Joy Hosiery Shop by check no. 69, dated November 18, 1967.

4. These four checks were drawn on an account known, inter alia, as the "Building Sinking Fund" or "Municipal Building Fund" or "Special Revenue Fund," and referred to below as the "Building Fund."

5. The payment to the Buckingham Room represented the cost of a luncheon reception held for officials from neighborhoring municipalities following a ribbon-cutting ceremony in dedication of the township's new highway garage in the fall of 1966. The highway garage was part of same complex as the municipal building.

6. The payment to Norman's Stationery represented the cost of 10 filing cabinets for the use of the township commissioners during their terms of office. As initially planned, these cabinets were to be kept in the conference room of the municipal building and were part of a larger purchase of furniture for that building. Thereafter, the board of commissioners unanimously agreed to have the cabinets situated in their homes to be returned to the township when each of them left office.

7. The payment to Mike Levine Associates represented the cost of public relation services for the dedication of the new municipal building on September 30, 1967, including the publication of a brochure for this occasion and the coordination of the dedication program at 10:30 a.m., which included guest speakers, the Congressman and a former Governor, musical

entertainment, outdoor and indoor displays, and an open house until 11:30 p.m., with guided tours of the new building and a reception at a local restaurant.

8. The payment to Joy Hosiery Shops represented the cost of skirt and blouse uniforms worn by five of the township's secretaries identifying them as tour hostesses at the dedication of the municipal building.

9. The township's manager in 1967 was Richard Lafferty, who held a master's degree in government administration, and who had worked for the township in that field since 1964. He determined in the first instance that the four payments be made from the building fund.

10. Each such surcharged payment was approved by the vote of seven of the commissioners. Three of the commissioners, Kline, Melio, and Reinholt, did not so vote or voted to the contrary.

11. The new municipal building and highway garage were constructed by the Bristol Township Authority and leased to Bristol Township. The building fund was the repository of the proceeds of taxes levied by Bristol Township in 1964 and in 1966, for municipal building purposes. These proceeds were applied to nonconstruction items such as rental payments and, inter alia, furniture, fixtures, landscaping and site work and insurance. In 1966, the building tax millage was one-half mill.

12. In 1967, the tax rate for general township purposes was 18 mills and for the fire department one mill. No other tax was levied.

13. Between June and October 1967, transfers in the nature of temporary loans were made from the general fund to the building fund amounting to $88,706.73, the building fund having been nearly depleted by June of 1967.

14. Such interfund loans are common practice in

municipal government in instances where revenue for a specific purpose is anticipated but not yet received.

15. In December 1967, in order to make partial repayment to the general fund, the township obtained a bank loan secured by assignments of anticipated receipts from the future sales of an existing township building and of a perpetual equity in the highway garage. This loan was authorized by resolution by the board of commissioners and the proceeds were deposited in the building fund.

16. Warrants executed by the president and the secretary of the board of commissioners, on December 15, 1967, and December 20, 1967, each in the sum of $30,000 were presented to the township treasurer, Harold Lefcourt, who drew checks on those dates in corresponding amounts on the building fund payable to the general fund. The budgetary code appearing on the warrants was a double zero (00) indicating the absence of a specific budgetary account classification.

17. The township sustained no monetary loss by reason of these interfund transfers of $60,000 to the general fund.

18. On or about May 30, 1967, Harold Lefcourt was duly appointed to the position of Treasurer and Tax Collector of Bristol Township to fill the vacancy created by the death of the elected treasurer-tax collector, Robert Cameron, who had been tax collector for 34 years.

19. On or about June 22, 1967, the tax duplicates for the year were delivered to Harold Lefcourt, who sent out his tax bills on July 20, 1967, and it was from July 20, 1967, that he calculated the discount and penalty periods.

20. Harold Lefcourt was not permitted access to the tax collection office itself until June 15, 1967, and

his predecessor's records, which contained notations of address changes and other pertinent information for locating taxpayers, were not made available to him at any time. As a result, approximately 80 tax bills for the year 1967 were misaddressed or sent to the wrong person.

21. By letters dated December 12, 1967, December 18, 1967, and January 19, 1968, Harold Lefcourt received authorization respectively from the Township Manager of Bristol Township, the County Treasurer of Bucks County, and the Board of Directors of the Bristol Township School District to determine and adjust such discounts and penalties as in his judgment were not the fault of the taxpayer but arose from improperly directed tax bills.

22. As a result of such determinations, Harold Lefcourt allowed discounts of $564.61 on tax payments made after September 20, 1967, and excused penalties of $262.09 on tax payments made after November 20, 1967, for both of which sums he was surcharged. Thereafter, each of the three taxing bodies referred to above specifically consented to the above-stated items of discount and of excused penalty.

23. The surcharge of Harold Lefcourt in the sum of $1,421 represented 20 days' interest at 3.5 percent per year on the sum of $740,834.32 for which the auditors in the supplement to their report gave the following explanation: ". . . for interest costs to the Township from its tax anticipation loan due to his extending the date of the tax bills issued for the year 1967 to July 20th instead of July 1st, without authorization. This amount is computed on $740,834.32 received after September 1st 1967 at the rate of 3.5% for twenty days."

24. The auditors' finding of a year-ending general fund deficit of $29,730.16 resulted from their inclusion

as disbursements certain checks in the total amount of $45,719.39. The township manager, Mr. Lafferty, withheld distribution of those checks acting on the advice of Peter Gelata, a principal in the accounting firm of Haskins and Sells, the township's accountant. The reason for not issuing such checks was to avoid a year-end deficit. The correct balance in the general fund on December 31, 1967 was $16,256.37. The auditors were informed of the above facts by Mr. Lafferty and Mr. Gelata prior to the preparation of the Auditors' Report.

## DISCUSSION

These four audit appeals arise under provisions of the First Class Township Code of June 24, 1933, P. L. 1206, art. X, sec. 1009, et seq., as amended, 53 PS §56009, et seq. Two of the appeals are to be sustained without objection from the auditors. The auditors do not press their surcharges of the three appellant commissioners ("minority commissioners") in that these commissioners did not vote in favor of the surcharged items; and they apparently concede that their finding of a year-ending deficit balance in the general fund was erroneous.[1] Further, they reduced the surcharge against the treasurer-tax collector by eliminating the assessment of $1,421 for having dispatched the tax bills on July 20th instead of July 1st.

Thus, the surcharges that are still before us are those against the seven appellant commissioners ("majority commissioners") and, as modified, the treasurer-tax collector. In regard to these, an evidentiary record was made. Two witnesses testified for the majority commissioners, one, a member of the firm of Haskins and Sells, the township's accountant, and

---

[1] We have also so found as a fact.

the other, the township manager in 1967. The treasurer-tax collector was the sole witness in his appeal. One of the auditors and a minority commissioner testified in support of the surcharges. Counsel have filed briefs together with requests for findings of fact and conclusions of law, and these appeals are now ready for disposition.

The treasurer-tax collector contends preliminarily that the surcharge procedure pursued by the auditors under the First Class Township Code, supra, is inapplicable to tax discounts and penalties. His argument is that the Local Tax Collection Law of May 25, 1945, P. L. 1050, 72 PS §5511.1, et seq., superseded The First Class Township Code as pertains to the audit, settlement and surcharge of a tax collector's taxation accounts. He cites Kennett Square Borough 1964 Financial Report, 42 D. & C. 2d 763 (Chest. Co., 1967), which so holds with reference to The Borough Code of 1927.[2] Having compared the acts here in question, we concur. Section 43[3] of The Local Tax Collection Law repealed section 1719 of The First Class Township Code, which provided that "[t]he accounts of collectors of taxes shall be audited by the township auditor or controller, as the case may be. The treasurer shall state a separate account for each different tax collected by him." It also repealed sections 1713-1718 of that act relating, inter alia, to the collection of taxes, penalties and exoneration. The duty to audit the treasurer's tax accounts was thus explicitly removed from The First Class Township Code, and a set of wholly differentiated auditing, settlement and sur-

---

[2] The Borough Code of May 4, 1927, P. L. 519, as amended, now superseded by The Borough Code of February 1, 1966, P. L. 1656 (1965), 53 PS §45101, et seq.

[3] 72 PS §5511.1 (Historical Note).

charge procedures was substituted by sections 26 and 41 of The Local Tax Collection Law, 72 PS §§5511.26 and 5511.41.

Moreover, we are persuaded by the well-reasoned analogy of Kennett Square Borough 1964 Financial Report, supra, that the other provisions, in sections 803 and 1003 of The First Class Township Code that refer to the auditing of a treasurer's tax accounts also were repealed in 1945 by the Local Tax Collection Law and were not revived despite their apparent subsequent reenactment in the Act of May 27, 1949, P. L. 1955, 53 PS §55101, et seq.

We are, therefore, of the opinion that the steps taken by the auditors in the present case to surcharge the treasurer-tax collector as to tax discounts and penalties failed to conform to the procedure established by the applicable law. Accordingly, we conclude that this aspect of the surcharge of the treasurer-tax collector was invalid and ineffective.

Section 1015 of The First Class Township Code, supra, 53 PS §56015, lays down the ground rules for our review of the balance of the auditors' report: "The accounts of the officer in question may be investigated de novo. The figures and facts found and stated by the auditors in their report of audit shall be taken as prima facie correct, as against any such officer, and the burden shall be upon each officer whose accounts are in question to establish the validity of the credits which he claims."

We thereby are empowered to "start the entire proceedings afresh and to consider all the accounts as if they had been presented to [us] in the first instance": Scranton School District Audit (No. 2), 354 Pa. 232, 234 (1946).[4] Thus, we are enabled and dutybound

---

[4] The same scope of review as here: Act of May 3, 1915, P. L. 311, secs. 1, 2.

where the need exists to examine the account of an official in its entirety. See Draper Appeal, 412 Pa. 26, 29 (1963); Audit of Township of Falls for 1967, 21 Bucks 229, 232 (1971). Such a de novo review is not mandated or obligatory in every instance, however. In the present case, we are not asked to do so, and we do not find a compelling reason to go outside the specific items of surcharge.

No fact question exists as to the items of surcharge that remain in issue. The treasurer-tax collector does not deny having drawn checks transferring $60,000 from the township's building fund to its general fund. The majority commissioners do not deny the payment of four items disallowed against them in the sum of $3,450.80.

The auditors give the following reasons for having disallowed the interfund transfers of $60,000 against the treasurer-tax collector: (1) they could find no records evidencing an authorization by the board of commissioners; (2) these transfers violated sections 804, 807 and 1701 of The First Class Township Code, supra, 53 PS §§55804, 55807 and 56701, which specify the form of warrant for the payment of money and which regulate certain interfund transfers and the use of special purpose funds.

In support of the surcharge of the commissioners, the auditors contend that three of the four payments taken as credits were not lawful township expenditures and that none of them was properly payable out of the township's building fund.

Under The First Class Township Code, any township officer whose act or neglect contributed to the financial loss of the township is liable for surcharge in the amount of such loss: Id, sec. 1003, 53 PS §56003. On appeal therefrom, section 1015 of the code places the burden of proving the validity of the disallowed credits on the surcharged official: Id, 53 PS §56015.

Cf. Washington County Controller's Case, 427 Pa. 631, 636 (1967). Here, in order for appellants to prevail, this means that they must establish the lawfulness of the disallowed items subject, however, to the following singularly important limitation. Where the failure to observe the law is the product of an honest mistake, the surcharge shall not exceed the municipality's actual financial loss. This modification of prior law occurred in the Act of May 15, 1945, P. L. 538 (No. 210), sec. 1, 65 PS §191, and continues in effect as relates to first class townships. In certain cases, such as those involving fraud or collusion, an official is not entitled to the act's protection: Id, sec. 2, 65 PS §192. Moreover, this court has recently found the parallel provision of The Second Class Township Code[5] to be inapplicable to the remuneration of township supervisors for certain services rendered where this compensation was deemed to have been in violation of public policy: Audit of Township of Warminster for the Year 1969, March term, 1970, no. 1726, opinion by Judge Lawrence A. Monroe, July 23, 1971. But aside from such exceptions, it is now clear that the function of a surcharge is compensatory, not punitive. See Davis v. Carbon County, 369 Pa. 322, 333 (1952); Yenerall Appeal, 165 Pa. Superior Ct. 144, 147 (1949); Audit of the Township of Falls for 1967, supra; Olyphant School District, 61 Lack. Jur. 197, 200 (1960); Bensalem Township Auditors' Report, 7 Bucks 237, 240 (1958); West Hazleton Borough Auditors' Report, 75 D. & C. 200, 208 (1959); Appeal of D. Lee Sharpnack, 38 Mun. L. Rep. 97, 102 (1946).

The auditors' position that under Lower Nazareth Township Supervisors' Appeal, 341 Pa. 171 (1941),

---

[5] Act of May 1, 1933, P. L. 103, art. V, sec. 545, as amended, 53 PS §65545.

a surcharge for a procedural impropriety is imposable despite the lack of actual loss, simply ignores, or is unmindful of, the remedial change effected by the Act of 1945, supra. Moreover, in the case before us, there is not the slightest evidence of fraud or of any fact that would deprive appellants of that act's benefit. See Davis v. Carbon County, supra, at pages 333-35. We will, therefore, deal with the asserted invalidity of the surcharged items only if it first appears that the township may at least arguably have sustained actual financial loss.

For example, we are satisfied that the transfers from the building fund into the general fund of $60,000 did not occasion a financial loss to the township. It is undisputed that these transfers constituted repayments of temporary loans from the general fund. The auditors do not challenge the interfund borrowing that gave rise to these loans, nor do they assert that it put the township to any expense. Furthermore, they do not contest the propriety of the township's obtaining a bank loan of $60,000 in December of 1967 and depositing the proceeds in the building fund. Their theory is that these moneys were misapplied by the treasurer-tax collector when he effectuated the transfers to the general fund. They claim that he acted improperly and without authorization. This, they contend resulted in a loss of assets to the building fund. We disagree.

These transfers had no effect at all on the building fund's balance sheet. They merely accomplished a substitution in loans payable. Rather than a financial loss, the overall result, as pointed out by the majority commissioners, was actually a savings. For it was the interfund borrowing earlier in the year that enabled the township to put off the day of having to resort to bank financing. There is nothing whatever in the record

to suggest that by virtue of the repayments of the general fund the township experienced a financial loss. Cf. Auditors of Cumru Township, 112 Pa. Superior Ct. 559, 561-62 (1934).

We, therefore, conclude, without addressing ourselves to the alleged irregularities in the payment warrants or in the transfers themselves, that this surcharge of the treasurer-tax collector was unfounded.

Similarly, the surcharge against the majority commissioners for the cost of the 10 filing cabinets can be disposed of as an expenditure that did not subject the township to any demonstrable loss. No contention is made that the purchase price exceeded their value. Though located in the commissioners' homes, the filing cabinets remained at all times the property of the township to be used for each commissioner's maintenance of official paperwork, an arrangement at least potentially to the township's advantage, not its detriment.

However, the other three items of expense, incurred for the dedications of the municipal building and the highway garage, cannot be resolved in the same fashion. The difference is that repayments of interfund loans and purchases of filing cabinets are not, in themselves, ultra vires. Clearly, a first class township is empowered to engage in such transactions for legitimate township purposes. In contrast, the auditors contend that the outlays for the building dedications were categorically unlawful as entertainment expense. Here, again, however, they do not dispute the worth of the items surcharged. Instead, they urge that any quid pro quo thus realized could not have been of lawful benefit to the township. Does the limitation of an official's liability to actual financial loss under the Act of 1945, supra, extend to such cases? Our decision does not turn on that question, because we

reject the argument that payments for expenses of this type necessarily or invariably require surcharge. We accept the majority commissioners' proof that under the law and the facts in this audit appeal, these particular expenditures were proper and permissible.

Whether entertainment and similar expenses involving the staging of community events are allowable at all depends on the nature of the occasion: McQuillin, Municipal Corporations, Vol. 15 (1970), §39.22. It is axiomatic that public funds are to be spent for public purposes. A municipality does not inherently or by statutory delegation for the general welfare have the power to expend funds for the celebration of events not primarily municipal in character or not directly related to the public interest: Commonwealth v. Gingrich, 21 Pa. Superior Ct. 286, 290 (1902). See Historical Pageant Association of the City of Philadelphia v. Philadelphia, 260 Pa. 447, 449 (1918). Cf. Kulp v. Philadelphia, 291 Pa. 413 (1928). Expenditures for functions essentially social or hospitable in nature are clearly improper and this applies particularly to occasions such as parties, receptions and banquets. See Stegmaier v. Goeringer, 218 Pa. 499, 502 (1907); Commonwealth v. Gingrich, supra.

But it has long been recognized as lawful in Pennsylvania for a city or town to appropriate moneys for the observation of an important historical, military or civic event (Sambor v. Hadley, 291 Pa. 395, 403 (1928)), and there are also three older cases approving the payment of dinner reception expenses for municipal officials and their guests at ceremonial civic occasions: Morton et al. v. Philadelphia et al., 4 Pa. Dist. 523 (1895); Tagg v. The City of Philadelphia, 18 W.N.C. 79 (1886); and Tatham v. The City of Philadelphia, 2 W.N.C. 564 (1876).

In the present case, we are of the opinion that the

dedications of the municipal building and of the high-way garage, which was part of the same building complex, were events of civic importance and affected with the public interest. As such, we think the expenditure was justified for the purchase of the distinctive uniforms for the hostess-guides. One of the main purposes of the dedications was to enhance the pride of the citizenry in the township's accomplishments. This is an appropriate purpose: Sambor v. Hadley, supra, and Stegmaier v. Goeringer, supra. We think the securing of public relations services for the dedication of a million dollar municipal building was justified on that basis. It is not argued that the cost or the scope of these services was excessive or inordinate, and we do not regard that issue as before us.

We also believe the restaurant receptions following the dedications to have been in keeping with the purposes of these celebrations. As stated in Tatham v. The City of Philadelphia, supra, at page 567: "It does not directly profit the great body of citizens that a few persons should eat and drink at their cost. Yet it cannot be denied that public entertainments, temperately supplied, and on occasions of great public interest, may produce a moral effect in which all may share . . ." We hasten to emphasize that such occasions are, in our view, a narrow exception to the prohibition against using public money for expenses of this type. Here, moreover, although the issue is not raised, the evidence suggests that the dedications held by the township were commensurate with the relative importance and character of those occasions and that the receptions were not the subject of extravagance or abuse.

However, the auditors press the point that the dedication expenditures did not come out of the township's general treasury but from the building fund. The First Class Township Code, supra, section 1709, paragraph

one, 53 PS §56709, authorizes "[a]n annual tax for general township purposes not exceeding twenty-five mills . . ." and, paragraph four, "[a]n annual tax so long as necessary, for the purpose of procuring a lot and/or erecting a building thereon for a townhouse, and for the payment of indebtedness incurred in connection therewith." Bristol Township had levied taxes in 1964 and 1965 for "municipal building purposes" and established the building fund as the repository of the proceeds.[6]

Appellant majority commissioners agree that the tax levy authorization stated in The First Class Township Code, supra, defines the parameters of the building fund. These are broad enough, they contend, to imply the power to pay for the filing cabinets and dedication expense, although that power is not express.

The record before us is skimpy on the overall nature and characteristics of the building fund, but we need not become embroiled in that argument. We are inclined to share the auditors' view that the township's power to raise money for a "townhouse" does not extend to these other expenditures. That taxing power, stated in its entirety, is to obtain a site and erect a building thereon, and to pay the debt obligation. Nothing in its recitation suggests that filing cabinets or building dedications are reasonably related or incidental to its execution. Cf. Centre Square Fire Co. v. Whitpain Township, 21 D. & C. 2d. 376 (Montg. Co. 1959). Those disbursements, we believe, should have been made from township's general treasury.

The auditors' argument that the payments from the building fund unlawfully circumvented the statutory millage limitation on the tax for general township pur-

---

[6] The sole evidence of the tax rate was the testimony that in 1966 it was one-half mill.

poses of 25 mills per annum is without merit. Bristol Township's levy for general purposes in 1967 was $1,055,312 at the rate of 18 mills, far short of the maximum authorized by the First Class Township Code. Moreover, the township closed the year 1967 with a surplus balance in the general fund of $16,256.37, as determined by its accountants, Haskins and Sells, and as the auditors now concede. We shall treat the sum of $3,450.80, which represents the total amount of the surcharged expenditures, as an advance chargeable to the general fund and shall direct that it be transferred from the general fund to the building fund in order to rectify the statement of those accounts.

## CONCLUSIONS OF LAW

1. It was procedurally improper for the auditors to follow The First Class Township Code in auditing the tax collection accounts of the treasurer-tax collector.

2. The township did not sustain actual financial loss by reason of (1) the transfers of $60,000 from the building fund to the general fund, or (2) the purchase of the filing cabinets for the use of the commissioners.

3. The cost of the hostess-guide uniforms and of the dedications of the municipal building and the highway garage were permissible as general township expenditures.

4. The building fund was not the proper account for the payment of those items or of the cost of the filing cabinets.

5. The auditors erred in determining that the year-ending balance in the general fund for 1967 was in the negative or deficit sum of $29,739.16. The balance was $16,256.37.

## ORDER

And now, February 15, 1972, the following order is entered:

1. The within appeals being May term, 1968, nos. 380, 381, 1261 and 1396, and each of them, are hereby sustained.

2. The Treasurer Tax Collector of Bristol Township is directed to transfer from the general fund to the building fund the sum of $3,450.80.

3. Whereupon, the auditors shall amend their report of audit so as to conform with this opinion and order.